## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

JUN 2 9 2020

David J. Bradley, Clerk of Court

AVERY L. AYERS
5380 West 34th Street
#212
Houston, Texas 77092

(ADD PERSON NAME)
each individually and on behalf of all
others similarly situated,

PLAINTIFFS,

V.                                        CIVIL NO. **4:20cv2297** _____

FEDERAL BUREAU OF PRISONS
320 First Street, NW
Washington, DC 20534

MICHAEL CARVAJAL, in his official
capacity as Director, Federal Bureau of
Prisons

U.S. Attorney General
Attn: Civil Process Clerk
1000 Louisiana Street
#2300
Houston, Texas 77002

Office of The Texas Attorney General
Attn: Ken Paxton
300 West 15th Street
Austin, Texas 78701

The GEO GROUP, INC
Leidel Residential Re-Entry Center
Leidel Comprehensive Center
Attn: Legal Dept.
1819 Commerce Street
Houston, Texas 77002

The Geo Group, INC
Attn: Legal Dept.

1

4955 Technology Way
Boca Raton, FL 33431

DEFENDANTS,

## CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND CLASS PETITION FOR WRITS OF HABEAS CORPUS

Plaintiffs Avery L. Ayers, and (ADD INMATE NAME), each individually and on behalf

of all others similarly situated, respectfully complain as follows against Defendants Federal

Bureau of Prisons ("BOP"), Michael Carvajal, Director of the BOP, and GEO GROUP, Inc.

## INTRODUCTION

1. This class action is being filed, in the midst of a massive global health emergency, on

behalf of all persons incarcerated by the Southern District of Texas and the Federal Bureau of

Prisons at the GEO Group Inc. halfway house in Houston, Texas.

2. THE GEO Group has a federal halfway house in Houston, Texas, with approximately 190

beds.  It is the only federally contracted halfway house for men and women in the Houston,

Texas area. The GEO Group, Inc. houses mainly federal prisoners who are about to be released.

During normal operations, prisoners come and go during the day for jobs, training and other

transitional service to look for work, to obtain medical care, to visit family, and for other

necessities.

3. As of March 31, 2020, there were 163,539 cases and almost 3,000 deaths attributable to

COVID-19 reported in the United States. That number grows daily because Houston, Texas had reported 377 cases of COVID-19 and at least 4 deaths, as of March 30, 2020. According to the World Health Organization, as of March 23, more than 332,900 people have been diagnosed with COVID-19 in 190 countries or territories around the world and 14,510 have died as a result. More than 7,800 inmates remained in the Harris County Jail. Tests confirm one of them has COVID-19 while 30 more have COVID-like symptoms and are awaiting results.

4. The Center for Disease Control and Prevention ("CDC") and other public health experts have advised that the best method to limit transmission of the virus is to avoid gatherings and practice "social distancing." [1] Health experts recommend a minimum of six feet between people, limited contact, and meticulous personal hygiene.

---

[1] Center for Disease Control, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (March 23, 2020)

5. It is the policy of the City of Houston, Texas and Harris County, Texas to require social distancing and to prohibit people gathering in groups. The Mayor has issued a series of Executive Orders that carry the force of law and include criminal penalties for those who do not follow these basic public health practices. [2] The Mayor's orders relied, in part, on the following findings:

> This Order is issued based on the increasing number of confirmed cases of COVID-19 within The City of Houston, Texas and throughout the metropolitan Houston region. Scientific evidence and public health practices show that the most effective approach to slowing the community transmission of communicable diseases like COVID-19 is through limiting public activities and engaging in social distancing. … Medical and public health experts agree that COVID-19 is easily transmitted and it is essential that its spread be slowed to protect the ability of public and private health care providers to handle the expected influx of ill patients and safeguard public health and safety. …. Because of the risk of the rapid spread of the virus, and the need to protect all members of Houston, TX, and the region, especially residents most vulnerable to the virus, and local health care providers and emergency first responders, this Order requires the temporary closure of the on-site operation of all non-essential businesses and implements a prohibition on large gatherings. [3]

6. Contrary to City of Houston policy and despite this guidance and the spreading pandemic, Defendants have forced prisoners at The GEO Group, Inc. to sleep in close quarters and bunk beds, about three feet apart. The prisoners eat together in crowded dining rooms and share bathrooms.

---

2 https://Houston.Culturemap.com/News/City-Life/03-17-20-Houston-Harris-County-State-of-Disaster-Emergency-30-days/

3 https://www.click2Houston.com/Health/2020/03/07/Latest-Follow-The-Developments-of-The-Coronavirus-Cases-In-The-Houston-Area/

7. The residents are also forced to clean the facilities themselves. Defendants do not provide adequate basic cleaning services. Further, Defendants have failed to provide prisoners with the most basic supplies to clean their living areas or maintain the rigorous personal hygiene the CDC is urging.

8. Typically, residents at The GEO Group, Inc. are allowed to leave the facility during the day for a job or to visit family. But Defendants suspended this freedom and have refused to release residents to live with their families or in their homes during this unprecedented and immediate health emergency.

9. The conditions maintained by Defendants in The GEO Group, Inc. make it impossible for the prisoners and pre-trial detainees housed there to avoid congregating in groups or practice social distancing, maintain the required hygiene and limit the high risk of spread of the COVID-19 virus.

10. Furthermore, Defendants have failed to provide even the most basic medical care during this health emergency. The GEO Group, Inc. has failed to provide prompt medical attention and testing to those with COVID-19 symptoms. The GEO Group, Inc. also does not have an on-site medical staff. Prisoners at The GEO Group, Inc. who are ill have been forced in recent days to call 9-1-1 themselves for help.

11. Defendants cannot keep the prisoners safe from the COVID-19 pandemic while housing them in group bunk rooms and tight living quarters without adequate sanitation, and while providing little or no medical care.

12. Defendants' continued inaction gravely jeopardizes the safety and lives of all Plaintiffs and approximately 190 other prisoners confined to The GEO Group, Inc., as well as the staff and the public.

13. Many of the people at The GEO Group, Inc. have been designated for home confinement by the BOP and are typically eligible for release on home confinement within 6 months of their release date.

14. Defendants have refused to exercise their discretion to provide early release and significantly reduce the population in the facility. Instead, Defendants have chosen to keep prisoners confined in tight quarters as the COVID-19 crisis spreads like wildfire. The continued incarceration of the Plaintiffs at The Geo Group, Inc. in conditions that contravene widely known health protocols is putting them, The GEO Group, Inc. staff, and the broader community at great risk for infection, illness, or death due to the COVID-19 pandemic.

15. The CDC guidelines are incorporated in the guidelines published on March 20, 2020, by the American Jail Association. [4] These guidelines recommend reducing jail populations as soon as possible, including by releasing inmates when at all possible. The guidelines also state that any new prisoners should be screened for COVID-19, as should facility staff on a daily basis.

16. The American Jail Association guidelines also implore correctional facilities to "provide free and readily available soap, hand sanitizer, and cleaning/disinfectant supplies for living areas." The guidelines state to replenish those supplies frequently and eliminate rules that label the products contraband. The guidelines suggest adding additional hand washing stations.

17. When discussing social distancing, the American Jail Association guidelines recommend serving food in housing units instead of having prisoners travel and congregate in dining halls. The guidelines also generally call for reducing activities that cause prisoners to congregate in large groups.

_____

4 American Jail Association, Recommended Strategies for Sheriffs and Jails (March 20, 2020).

18. Health experts have warned that there is an increased risk of contracting and transmitting COVID-19 when groups of people live, eat, and sleep in close proximity.

19. In response to this guidance, jurisdictions around the world and in the United States have taken bold actions to save lives for inmates and for the community. Germany released "1,000 prisoners who are close to the end of their sentences"; Canada released "1,000 inmates in the state of Ontario"; and Iran "temporarily release[d] 85,000 prisoners, with 10,000 of them being granted pardons."[5] The New Jersey Supreme Court announced that it would release "as many as 1,000 people from its jails" [6] and New York City is releasing more than 1,000 people from its jails.[7] This effort to downsize facilities like prisons and jails, which are breeding grounds for the highly contagious virus, is not limited to the South Coast. It is an urgent nationwide effort. Cuyahoga County, Ohio, announced plans to rapidly release around 600 people from the county jail just two days after President Trump declared a national emergency; Washington County, Oregon, released more than 120 people from the local jail; Alameda County, California, released 314 people from their jail; the Iowa Department of Corrections began to release 700 people from state prisons; Mercer County, Pennsylvania, released 60 of 308 people in their jail.[8] Despite such actions around the country, the Southern District of Texas and BOP have failed to act.

---

5 Michael Nienaber et al., Lock 'Em Up or Let 'Em Out? Coronavirus Prompts Wave of Prisoner Releases, REUTERS, March 25, 2020.

6 Tracey Tully, 1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk, N.Y. TIMES, March 23, 2020.

7 NYC to Release More Than 1,000 Prison Inmates Due to Coronavirus Concerns, ASSOC. PRESS, March 25, 2020.

8 Kimberly Kindy et al., 'Disaster Waiting to Happen': Thousands of Inmates Released as Jails and Prisons Face Coronavirus Threat, WASH. POST, March 25, 2020.

20. Given the size of the current population inside The GEO Group, Inc. and the structure of the living arrangements, the facility simply cannot provide the safety and COVID-19 protection that is constitutionally mandated under the Eighth Amendment.

21. Because of Defendants' continuing violations of Plaintiffs' constitutional rights, Plaintiffs seek class-wide relief requiring Defendants to join other jurisdictions in reducing the population of The GEO Group, Inc. and to implement other basic health and safety policies and procedures that would mitigate the risk to Plaintiffs.

Plaintiffs therefore ask this court for declaratory and injunctive relief, including requiring Defendants to: release enough people such that the remaining people can be housed safely and in compliance with CDC guidance at The GEO Group, Inc; and provide living, dining and sleeping arrangements that permit social distancing for those prisoners who remain at The GEO Group, Inc.

## JURISDICTION

22. This Court has subject matter jurisdiction over the allegations presented herein pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (original jurisdiction), 28 U.S.C. §§ 2201-02 (declaratory relief), and 28 U.S.C. § 2241 (habeas jurisdiction). Plaintiffs' claims under the common law of the Southern District of Texas arise from the same events as the federal claims and are within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## VENUE

23. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts or omissions that give rise to Plaintiffs' claim occurred or will occur in the Southern District of Texas.

## PARTIES

## PLAINTIFFS

24. Mr. Avery L. Ayers is a 52-year-old man. Mr. Ayers is also a Honorable Discharged U.S. Air Force veteran. He has been at The GEO Group, Inc. since February 24, 2020.

25. Mr. Ayers has already served all of his 5-year prison sentence Mr. Ayers will be released on Supervised Release on July 21,2020. He was transferred to The GEO Group, Inc. from Federal Correctional Institution – Beaumont (camp).

26. Mr. Ayers was hurriedly moved on June 8, 2020, from H-Dorm along with several other inmates very quickly so that H-Dorm could be converted into a Quarantine unit for five (5) Covid-19 positive residents.

27. Mr. Ayers fractured his left pinkie finger on his left hand during the moving from H-Dorm to C-Dorm during the moving Mr. Ayers smashed his left pinkie finger in the door jamb of H-Dorm as he was moving his belongs. Mr. Ayers suffered a severe curve cut with blood loss, bruising and/ or contusion because the area becomes swollen, raised, and with painful swelling

28. Mr. Ayers went to Mr. Hardy and other staff members with the injury and they didn't think he needed to go to the hospital at that time.

29. Mr. Ayers was given some antiseptic spray and bandages to dress the injured finger.

30. Mr. Ayers went to work on June 10, 2020, at the V.A. Hospital – Laundry Dept. after work Mr. Ayers went to the emergency room as a precaution for his injured finger. Mr. Ayers called The GEO Group, Inc. to inform Mr. Bennett that he was at the emergency room and would be late returning to the RRC/Halfway House.

31. Mr. Ayers was called on June 11, 2020, by the V.A. Hospital where he was informed that he would need to return to the V.A. Hospital for more x-rays on his left pinkie finger. Mr. Ayers

was allowed to go to the V.A. Hospital where they took more x-rays of his left pinkie finger. Mr. Ayers completed the x-ray process and left the V.A. Hospital. Mr. Ayers continued to clean and bandage the injured left pinkie finger so as not to let it become infected.

32. Mr. Ayers received a message on June 12,2020, from his primary care physician Doctor Johnson - concerning his fractured left pinkie finger and if he could return to the V.A. Hospital so it could be set correctly and a splint placed on it to immobilize his ring and pinkie finger together.

33. Mr. Ayers called back Dr. Johnson office and spoke with the LVN who inform him that he needed to come back to the V.A. Hospital because the x-ray showed that his left pinkie finger was fractured and Doctor Johnson had already made an appointment with the orthopedic hand specialist to make a splint for his fingers. Mr. Ayers call his case manager Ms. Williams to get permission to return to the V.A. Hospital with the LVN on a three-way call Ms. Williams informed the LVN that Mr. Ayers had been exposed to the coronavirus (Covid-19) at the facility and was in a 14-day quarantine period. The LVN informed Mr. Ayers that he couldn't come to the V.A. Hospital until after the 14-day quarantine ended for him.

34. Mr. Ayers received a call from Doctor Johnson who informed him on the proper care of his fractured finger and to make a homemade splint to assist with the setting of the fractured finger.

35. Mr. Ayers since June 12, 2020, has been tending to his fractured and injured finger on his own and with no medical attention from the GEO Group Staff.

36. Mr. Ayers lives in  C-Dorm at The GEO Group, Inc. with 80 other men.

There are about 80 total prisoners in C-Dorm — including several residents who have reportedly tested positive for COVID-19.

37. Once released, Mr. Ayers plans to live in Houston, Texas. During this

extraordinary time, Mr. Ayers would be safer living by himself instead of being crammed

into C-Dorm with other prisoners in The GEO Group, Inc. halfway house.

## DEFENDANTS

38. Defendant BOP is a federal law enforcement agency subdivision of the United States

Department of Justice and is responsible for the administration of federal prisons, and certain

halfway houses, including The GEO Group, Inc.  BOP maintains physical custody of Plaintiffs.

39. Defendant Michael Carvajal is the Director of the Federal Bureau of Prisons. He is sued

in his official capacity.

40. Defendant The GEO Group, Inc., is a privately owned halfway house in Houston, Texas.

The GEO Group, Inc. has contracts with the BOP to provide housing and care to the

plaintiffs and others similarly situated. The GEO Group, Inc. houses both persons who have been

released from federal correctional facilities, persons awaiting trial in the Southern District of

Texas, and persons placed there by the U.S.P.O.


## FACTUAL BACKGROUND

## COVID-19 Presents A Serious Risk of Harm in the Criminal Justice System

41. Outcomes from COVID-19 vary from asymptomatic infection to death. Some individuals

who contract the disease may experience mild symptoms, while others may suffer respiratory

failure and death. People with pre-existing medical conditions, such as asthma, kidney disease,

heart disease, obesity, and diabetes, are at an increased risk of having- serious complications if

they contract COVID-19.

42. In the highest risk populations, the fatality rate is about 15 percent, meaning that out of

100 vulnerable people infected, fifteen (or approximately 1 in 7) will die.

43. Those who do not die may experience long-term harm. COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity.

44. Research shows that avoiding groups and social distancing is a critical means of risk mitigation. Distancing must occur before individuals display symptoms, as they may be contagious before they are symptomatic. The CDC recommends a social distance of *at least* 6 feet to minimize the risk of spread. This CDC guidance extends this to correctional facilities: prisoners' beds should be at least 6 feet apart.

45. Given the nature of congregation in detention facilities, there is an increased risk that COVID-19, a highly contagious disease, will spread more quickly to a larger number of people. This Court has already recognized that the risk of spreading the virus in jail is "palpable" and risks overburdening the healthcare resources of the facility and the surrounding community. Given this inherent danger, courts around the country, including the Southern District of Texas, have released people from incarceration due to concerns about COVID-19.[10]

---

10. 106 people who were incarcerated on Rikers Island for Technical Parole Violations were ordered to be released on March 27, 2020 (see https://legalaidnyc.org/wpcontent/ uploads/2020/03/03-27-20-Secures-Release-of-106-Incarcerated-New-Yorkers-at-ahigh- risk-of-COVID-19-from-Technical-Parole-Violation-Holds-on-Rikers- Island.docx.pdf?fbclid=IwAR3IvbeyQ1BdlVdnwjsZjVd_S71X06ppuQAyGK2vUj7n2XpOa5U RMPyZfQ; A defendant with a history of gun and drug charges was released to home confinement due to concerns related to COVID-19 spread. *U.S. v. Jaffee*, No. 19-cr-88-RDM (D.D.C. Mar. 26, 2020); A defendant convicted of child pornography charges was released to home confinement due to concerns related to COVID-19 spread. *U.S. v. Harris*, No.19-cr-356-RDM, Dkt. No. 36 (D.D.C. Mar. 26, 2020).

## Conditions in The GEO Group Halfway House

46. The conditions in the facilities disregard all medical and public health

directives for risk mitigation. The GEO Group, Inc. does not encourage or practice social

distancing in its facilities. Furthermore, the structure and layout of The GEO Group, Inc. makes

social distancing impossible.

47. There are many opportunities for the virus to enter The GEO Group, Inc.

48. Although prisoners are currently not allowed to leave The GEO Group, Inc, The GEO Group,

Inc. still is admitting new prisoners. The CDC guidelines recommend screening for any new

prisoners to detect potential COVID-19 symptoms.

49. Defendants have admitted new individuals, prisoners without screening and without

quarantining. This creates a heightened risk that the virus will be introduced into the facility.

50. Defendants started taking temperature of staff and residents each day after confirmed case on

6-1-2020.

51. On March 23, 2020, The GEO Group, Inc issued a shelter in place order for all prisoners.

This order has exacerbated crowded conditions at The GEO Group, Inc., because all of the

prisoners must stay in the facility at all times.

52. Prisoners in The GEO Group, Inc. live in close quarters and cannot achieve the "social

distancing" needed to effectively prevent the spread of COVID-19.

53. The CDC recommended that correctional facilities provide no-cost access to soap,

running water, and tissues to all prisoners.

54. Prisoners in The GEO Group, Inc. have limited access to hot water, soap, disinfectants,

gloves, and masks. The GEO Group, Inc. has not provided hygiene and cleaning supplies to

people incarcerated there. Prisoners are responsible for purchasing their own hygiene supplies,

13

but there is no commissary at the facility.  Since the lockdown of the facility began on April 23,

2020, prisoners have to rely on family, if they have family in the area, to drop off hygiene

supplies.

55. Prisoners are responsible for cleaning and sanitizing their own dorms and common

areas, including the shared bathrooms.

56. They frequently lack adequate cleaning supplies to do so.

57. Prisoners report that the cleaning supplies are not readily available and those that are

available are watered down.

58. Lysol and alcohol-based cleaning supplies are not permitted because they are considered

contraband.

59. No hand sanitizer is available to people incarcerated at The GEO Group, Inc. because it is

considered contraband.

60. Tissues are not readily available.

61. According to The GEO Group, Inc., toilet paper is distributed twice a week.

62. Hallways also pose risks of contagion: prisoners share the hallways, and everyone,

including quarantined individuals, use the hallway to access services.

63. The GEO Group, Inc. dining facilities preclude the CDC-recommended social distancing and

increase transmission opportunities. Prisoners at The GEO Group, Inc. eat meals in large groups

of about 20-25 people at any given time.  Five people must sit at each of five or six square tables,

which are approximately 6 feet in diameter. People eat from open trays in these crowded spaces.

Additionally, prisoners take their silverware from an open communal box.

64. The dining area is not in the same buildings in which prisoners live. Consequently, on

the way to the dining hall, prisoners must touch or open doors that are touched by many other

prisoners. There is no sink in the dining area, so prisoners have no means to wash their hands before they eat and after touching doors that they needed to open on the way to the dining area.

65. When The GEO Group, Inc. suspects someone may have contracted COVID-19, The GEO Group, Inc. places that person in isolation by assigning the person to an empty dorm without roommates.

66. The quarantined person continues to share hallways, laundry and pill distribution with the rest of the residents living in the building. Staff or Residents bring food trays to quarantined residents.

67. The GEO Group, Inc. has not educated prisoners on ways to minimize community spread of COVID-19.

68. The GEO Group, Inc. does not have on-site medical staff. Prisoners receive medical treatment only if they are sent by ambulance to a hospital.

69. The GEO Group, Inc. has not informed the population of any protocol for isolating symptomatic prisoners.

70. These crowded conditions, in both sleeping and social areas, and the shared bathrooms maximize the likelihood that COVID-19 will spread rapidly across the facilities, infecting vulnerable detainees.

71. The conditions in The GEO Group, Inc. are dire. They are contrary to CDC guidance and BOP guidelines. Defendants have created a significant and immediate risk of spreading COVID-19, putting the prisoners health and lives in danger.

## The GEO Group, Inc. Continues to Expose Plaintiffs to Dangerous Conditions of Confinement Despite Being Advised of These Dangers

72. Public health measures across the country demonstrate the widespread recognition that protecting individuals from potentially serious illness or death from COVID-19 requires practice social distancing and increased hygiene.

73. On March 23, 2020 the Center for Disease Control issued the Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities. The guidance specifically recommends implementing social distancing strategies to increase the physical space between people, "ideally 6 feet between all individuals, regardless of the presence of symptoms"

74. The University of Texas at Austin's Lyndon B. Johnson School of Public Health, issued Recommended Strategies For Sheriffs And Jails To Respond To The Covid-19 Crisis. The guidance includes suggestions for ensuring safe practices within the prisoner population to reduce the risk of COVID-19. In particular, it suggests reducing the prisoner population, implementing screening measures, providing free hygiene products for living areas, communicating information to prisoners on the symptoms and risks of COVID-19 as well as ways to prevent its spread, and responding swiftly to any cases.

75. The CDC guidance also states that facilities should "ensure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs within the facility." The CDC lists cleaning supplies, soap, and daily medical supplies as supplies that should be within the facility.

76. The Federal Bureau of Prisons began preparing for COVID-19 response in January 2020, including issuing guidance to screen inmates and staff. BOP's COVID-19 guidance was shared with private prisons and RRCs for dissemination to staff and inmates in these facilities, so that

16

similar protocols can be implemented. The BOP states that facilities should be screening all newly-arriving prisoners for COVID-19, asymptomatic inmates with exposure risk factors should be quarantined, symptomatic inmates with exposure risk factors should be isolated.

77. BOP also stated that they would "implement nationwide modified operations to maximize social distancing and limit group gathering in our facilities" The guidance suggested staggering meal times.

78. BOP is charged with establishing policies and regulations that are safe, humane, and secure for all federal penitentiaries and other prison facilities. BOP has discretion to place prisoners on home confinement or furlough.

79. The GEO Group, Inc. detains all prisoners in contradiction of CDC and BOP guidance.

80. The GEO Group, Inc.  has also tried to silence the prisoners' cries for help. Staff of The GEO Group, Inc. threatened prisoners with discipline if they call any county or city agencies for Covid-19 information, testing, or informing them of the death at the facility.

81. The GEO Group, Inc. has not reported the Covid-19 related deaths at the facility.

  - Roger Dale Rust – Fed Reg No. 08898-479 – May 31, 2020 (Deceased).

  - Michael Kean McLarty – Fed Reg No. 39774-080 – June 14, 2020 (Deceased)

  - Cedric Keith Oliphant – Fed Reg No. 44684-379 – June 14, 2020 (Deceased)

# LEGAL FRAMEWORK

## Plaintiffs Have a Constitutional Right to Reasonable Safety in Confinement.

82. The Eighth Amendment prohibits cruel and unusual punishments. U.S. Const. Amend. VIII.

83. The government has an affirmative duty to provide conditions of reasonable health and safety when it detains or incarcerates them. *Brown v. Plata*, 563 U.S. 493, 510-11 (2011).

84. The reach of the Eighth Amendment includes "exposure of inmates to serious, communicable disease." *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

85. The Eighth Amendment requires that "inmates be furnished with … reasonable safety and the Supreme Court has explicitly recognized that the risk of contracting "serious contagious diseases" may constitute such an "unsafe, life-threatening condition" that it threatens reasonable safety." .A potential COVID-19 outbreak poses a substantial risk of serious harm to every person housed in The Geo Group, Inc.

86. The risk of exposure to COVID-19 constitutes a serious risk to health. Under the current conditions in The Geo Group, Inc., Defendants have not and cannot protect Plaintiffs from the risk of this serious harm.

87. Defendants have acted with deliberate indifference to the needs of the plaintiffs, by, *inter alia:*

    a.  Ignoring conditions that are very likely to cause serious illness such as: crowded dining rooms, crowded sleeping quarters, lack of access to cleaning products, lack of access to products to maintain personal hygiene.

    b.  Ignoring CDC and BOP guidelines about posting signage to educate prisoners about COVID-19, its symptoms, and preventative measures.

    c.  Ignoring CDC guidelines and professional guidance to create social distance of about six feet between persons to help stop the spread of COVID-19.

    d.  Continuing to admit new prisoners.

    e.  Failing to test newly admitted individuals.

    f.  Failing to screen prisoner personnel as they enter the facility on a daily basis.

    g. Not having an on-site medical staff to address health concerns as they arise during a global pandemic.

## Defendants Have Breached Their Duty of Care Owed to the Prisoners Resulting in Harm

88.  Defendants knew of the dangers associated with COVID-19 and failed to mitigate the risks. The BOP issued guidance to their facilities on how to deal with COVID-19.

89. Defendants breached that duty by, *inter alia,* failing to provide care consistent with directives from the CDC and BOP. For example, The GEO Group, Inc. failed to:

    a.  Provide prisoners with the opportunity to practice social-distancing, including by staggering meal times, or confining less people to one apartment. The GEO Group, Inc. continues to feed 25-30 prisoners at a time in a common area. Prisoners have to sit five to a table. The tables only have a six-foot diameter making it impossible for the recommended six feet for social distancing. Prisoners have to sleep in bunk beds that are very close together.

    b.  Provide sanitary conditions and supplies to maintain good hygiene.

    c.  Stop admitting new prisoners or at the very least screen or test incoming prisoners for COVID-19 symptoms before admission.

d. Screen The GEO Group, Inc. staff as they enter the facility on a daily basis.

e. Follow CDC and BOP guidelines about posting signage to educate prisoners about COVID-19, its symptoms, and preventative measures.

f. Have medical staff on-site to address health concerns as they arise during a global pandemic.

90. The GEO Group, Inc. failures have caused plaintiffs to suffer increased risk of harm and have increased the threat from existing conditions.

## CLASS ALLEGATIONS

91. Plaintiffs bring the causes of action identified below on behalf of themselves and all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2). For those causes of action, Plaintiffs seek injunctive and declaratory relief applicable to members of the class, as defined below.

92. Plaintiffs bring this action on behalf of the following class: All persons who were, as of the filing date of the complaint in this case, or will be in the future, confined in The GEO Group, Inc.  Plaintiffs reserve the right to amend the class definition or establish sub-classes as appropriate if discovery or further investigation reveals the class should be expanded or otherwise modified.

93. Class action status for this litigation is proper under Rule 23(b)(2) because:

a. The class is so numerous that joinder is impracticable. Based upon information and belief, the size of the class is approximately 200 people and is therefore so numerous that joinder is inherently impracticable for that reason alone. Joinder is also impracticable for other, independent reasons. Proposed class members are highly unlikely to file individual

suits on their own, as all are incarcerated and many are indigent, and thus have limited access to their retained or court-appointed counsel due to Defendants' policies, are currently incarcerated, fear retaliation from filing suits against Defendants, and lack access and financial resources to obtain qualified counsel to bring such suits.

b. The claims of the class share common issues of fact and law, including but not limited to whether Defendants' policies regarding health and hygiene as relevant to the COVID-19 pandemic — policies that systemically affect all proposed class members — violate the Eighth Amendment to the United States Constitution. The resolution of this question will drive the outcome of the litigation.

c. The claims of Plaintiffs are typical of those of the class as a whole, because each Plaintiff is currently in Defendants' custody and Plaintiffs' claims arise from the same policies and procedures (or lack thereof) that provide the basis for all proposed class members' claims.

d. Plaintiffs are adequate class representatives who meet all of the requirements of Rule 23(a)(4). They have no conflicts of interest in this case with other class members. They will fairly and adequately represent the interests of the class, and each understands the responsibilities of a representative. Counsel for Plaintiffs will vigorously prosecute the interests of the class and include attorneys with extensive experience with the factual and legal issues involved in representing jail and prison inmates, in asserting constitutional rights, and/or in pursuing class actions.

94. Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making final declaratory and injunctive relief appropriate with respect to the class as a whole under Federal Rule of Civil Procedure 23(b)(2).

## CAUSES OF ACTION

## Claim I: Violation of Eighth Amendment

(against Defendants Federal Bureau of Prisons and Carvajal)

95. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

The Eighth Amendment guarantees post-conviction detainees the right to reasonable safety. The Government's failure to provide a safe environment during a widespread outbreak of a contagious disease constitutes deliberate indifference to the health and safety of persons at The GEO Group, Inc., thereby establishing a violation of the Eighth Amendment.

96. Defendants have failed to provide adequate protections at The GEO Group, Inc., where Plaintiffs are not able to take steps to protect themselves through social distancing and other guidelines set by the CDC. Furthermore, The GEO Group, Inc. is not taking precautions to protect persons housed from the threat of the virus coming into the facility from guards/ staff who come in and out of The GEO Group, Inc. daily.  As COVID-19 rapidly spreads throughout the country, the already unsafe conditions at The GEO Group, Inc. will be intensified, and the ability to protect oneself will become even more impossible.

97. Defendant's failure to adequately protect Plaintiffs' constitutes a violation of their Eighth Amendment rights.

98. Federal courts have inherent equitable authority to order injunctive and declaratory relief to remedy violations of the Constitution by federal actors. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

## Claim II: Violation of Eighth Amendment Rights / 42 U.S.C. § 1983

(against Defendants in The Southern District of Texas and Carvajal)

99. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

100. Section 1983 provides that "every person, who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, or the Southern District of Texas, subject or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution…shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

101. By failing to provide adequate conditions in the midst of a global health pandemic, Defendant in The Southern District of Texas has violated Plaintiffs' Eighth Amendment rights for the same reasons alleged in Claim I.

## Claim III: Negligence

(against Defendant The GEO Group, Inc.)

102. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

103. Defendant The GEO Group, Inc., via its employees and agents, is well aware of the danger of COVID-19.

104. The GEO Group, Inc. owes a duty of care to Plaintiffs and breached that duty by failing to respond to the danger of COVID-19 by providing adequate conditions for prisoners.

105. The GEO Group, Inc. breach has caused the plaintiffs harm by exposing them to a serious risk of great harm and death.

# PRAYER FOR RELIEF

Plaintiffs therefore respectfully request that this Court grant the following relief:

106. Certify the class of all current and future residents of The GEO Group, Inc.

107. Issue a declaration that the conditions to which Plaintiffs are subjected at The GEO Group, Inc. place Plaintiffs at an unreasonable risk of contracting serious illness.

108. Issue an injunction requiring that Defendants address the inadequate conditions at The GEO Group, Inc. The injunction should require:

a. That Defendants release enough people such that the remaining people can be housed safely and in compliance with CDC guidance at The GEO Group, Inc.;

b. That Defendants take appropriate sanitary measures, including, *inter alia*:

   i. Clean the prisoners' rooms daily;

   ii. Reduce the number of people at each meal time to facilitate social distancing pursuant to CDC guidelines;

   iii. Reduce the number of prisoners sharing bedrooms to facilitate social distancing pursuant to CDC guidelines;

   iv. Reduce the number of prisoners sharing bathrooms to ensure good hygiene;

   v. Provide products for prisoners to maintain a clean space and ensure good personal hygiene; and

   vi. Ensure food safety, including ensuring that persons handling the food have been tested or screened for COVID-19 symptoms.

c. That Defendants stop admitting new prisoners to The GEO Group, Inc.;

d. That Defendants provide an on-site medical team;

e. That defendants screen staff and any person for COVID-19 symptoms upon every

entry into the facility;

f.   That Defendants screen any and every prisoner who complains of COVID-19 symptoms for the virus. Defendants should also implement isolations and quarantines when necessary; and

g.   That Defendants follow CDC and BOP guidelines and post signage to alert prisoners to the symptoms of COVID-19, and ways to prevent the spread of the virus.

109. Issue a Writ of Habeas Corpus and order the immediate release of Plaintiffs and sufficient members of the Plaintiff Class to ensure that the remaining residents can effectively practice social distancing and safe sanitation measures, with appropriate precautionary public health measures, on the ground that their continued detention violates their constitutional rights;

110. In the alternative, issue injunctive relief ordering all Defendants to immediately release Plaintiffs, with appropriate precautionary public health measures, on the grounds that their continued detention violates their constitutional rights;

111. Award Plaintiffs their costs and reasonable attorneys' fees in this action under the Equal Access to Justice Act ("EAJA"), as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, The Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988, and on any other basis justified under law; and

112. Grant any and all other such relief that this Court deems just and equitable.


Dated: June 27, 2020                                  Respectfully submitted,

                                                      Avery L. Ayers, Pro Se
                                                      5380 West 34th Street
                                                      #212
                                                      Houston, Texas 77092

# **Certificates of Service**

I hereby certify that on the _27_ day of _June_, 20_20_, I will mail a copy of the

Class Action Complaint for Injunctive and Declaratory Relief and Class Petition

for Writ of Habeas Corpus Motion with the Clerk of Court using the U.S. Post

Service with sufficient postage to the following:


United States District Courthouse
Attn: Clerk – Civil Processing
P. O. Box 61010
Houston, TX 77208



Dated: _27_____, day of _June_____, 2020.




Avery L. Ayers, Pro Se
5380 West 34th Street
#212
Houston, Texas 77002

## **Certificates of Service**

I hereby certify that on the _27_ day of _June_, 20_20_, I will mail a copy of the

Class Action Complaint for Injunctive and Declaratory Relief and Class Petition

for Writ of Habeas Corpus Motion with the Clerk of Court using the U.S. Post

Service with sufficient postage to the following:

Federal Bureau of Prisons
Attn: Michael Carvajal
320 First Street, NW
Washington, DC 20534

Dated: ___27___, day of ___June___, 2020.

Avery L. Ayers, Pro Se
5380 West 34th Street
#212
Houston, Texas 77002

## **Certificates of Service**

I hereby certify that on the 27 day of June, 2020, I will mail a copy of the Class Action Complaint for Injunctive and Declaratory Relief and Class Petition for Writ of Habeas Corpus Motion with the Clerk of Court using the U.S. Post Service with sufficient postage to the following:

U.S. Attorney General
Attn: Civil Process Clerk
1000 Louisiana Street
#2300
Houston, Texas 77002

Dated: _____27_____, day of _____June_____, 2020.

Avery L. Ayers, Pro Se
5380 West 34th Street
#212
Houston, Texas 77002

## **Certificates of Service**

I hereby certify that on the 27 day of June, 20 20 I will mail a copy of the

Class Action Complaint for Injunctive and Declaratory Relief and Class Petition

for Writ of Habeas Corpus Motion with the Clerk of Court using the U.S. Post

Service with sufficient postage to the following:


Texas Attorney General Office (**Delivery Address**)
Attn: Ken Paxton
300 West 15th Street
Austin, Texas 78701


Dated: 27 , day of June , 2020.




Avery L. Ayers, Pro Se
5380 West 34th Street
#212
Houston, Texas 77002

## Certificates of Service

I hereby certify that on the 27 day of June, 2020 I will mail a copy of the Class Action Complaint for Injunctive and Declaratory Relief and Class Petition for Writ of Habeas Corpus Motion with the Clerk of Court using the U.S. Post Service with sufficient postage to the following:

The GEO GROUP, INC
Leidel Residential Re-Entry Center
Leidel Comprehensive Center
Attn: Legal Dept.
1819 Commerce Street
Houston, Texas 77002

Dated: 27 , day of June , 2020.

Avery L. Ayers, Pro Se
5380 West 34th Street
#212
Houston, Texas 77002

## **Certificates of Service**

I hereby certify that on the $27$ day of June, 20$20$ I will mail a copy of the

Class Action Complaint for Injunctive and Declaratory Relief and Class Petition

for Writ of Habeas Corpus Motion with the Clerk of Court using the U.S. Post

Service with sufficient postage to the following:


The Geo Group, Inc.
Attn: Legal Dept.
4955 Technology Way
Boca Raton, FL 33431
(561) 893-0101



Dated: ____$27$____, day of ____June____, 2020.




Avery L. Ayers, Pro Se
5380 West 34th Street
#212
Houston, Texas 77002